And we will begin with Ms. Dimkar. May it please the court, I am Irene Dimkar. I represent Michael White, Linda White, and their three children in this 1983 action. I'm going to start, first of all, with Samadji Haile's guilty plea. Samadji Haile was the teenager who ran into the building. The court erroneously took judicial notice of Haile's subsequent conviction and guilty plea and found, as a matter of law, that there was probable cause justifying the defendant's entry into the plaintiff's home. That led to a direct verdict on all claims except excessive force. Now, is it clear that that's the way the causation arrow ran? Because sometimes, you know, you'll be looking ex ante, as you should, to see if there's probable cause. But something else is in the record that would tend to reinforce the account of the police officers, that they observed something or that something came to their attention. And so I just want to know exactly how confident we can be that the court made that fairly elementary mistake. By relying on the guilty plea, which, of course, was not there in the midst of this wild chase through the streets of Chicago. The court relied on it and then actually said, as a matter of law, gave instructions to the jury that Haile was in possession of the drugs, that he dropped the drugs, and that he pled guilty, and that they would have to accept that as the truth. And throughout the trial, he said nothing before police officers get to the front door is relevant. He said that very, very clearly. He also said very clearly several times during the trial that plaintiffs were trying to assert Haile's constitutional rights, not understanding that they were asserting their own constitutional rights. No, I mean, they surely were asserting their own rights not to have the police barge into their house, you know, no matter why the police were doing that. Now, whether the police had a right to do that or not is a different question, but I didn't think that they were asserting Mr. Haile's rights. Well, the court said, I think this answers your question, that the court says that plaintiffs were trying to collaterally attack this conviction, and he was not going to let that happen. He even threatened sanctions on a plaintiff's attorney. That seems entirely impossible. I mean, that seems off base, but I guess my question is, you know, how important is all of this in the end? Because we have a situation from the correct standpoint where there are findings that Haile's, that the police see Haile's trying a couple of houses and bursting into the home of the whites, just as I guess Michael Sr. is trying to leave the house. He clearly is injured somehow, whether by accident or whatever. And for all the police know, the residents of the house are in danger. You know, here's some person who's come barging into their house. They don't know whether he's armed or not. They don't know anything. So they run in afterwards, and so I'm trying to focus on exactly what the whites are. They don't think that the police should have entered to begin with. I think that's a hard case for you to make. Maybe they shouldn't have stayed there for two hours after they have Haile's under control. That's different yet. And I have to say I'm a little confused about all this GPS discussion because it's not clear to me that there's a time that all six of the officers are out there chasing. And if there's somebody able to be behind the wheel and somebody else chasing, there's no problem at all with GPS. There are several questions there. First of all, it was an afterthought of the police that they said Samadji Hailes was trying gates. Our witnesses said that he was trying gates. If we had been allowed the GPS evidence, GPS evidence showed that the vehicles were riding all over the place and then pulled up in front of the house, the officers rushed to the front door. But they could have been, though, with one person driving and another person running. The GPS data seems to show cars slowing to one mile, one mile per hour, which is essentially stop. And there are also gaps of several seconds around those low speeds. You know, a foot chase seems very possible to me under those circumstances. The GPS evidence shows that these cars never went down the alley. The most glaring discrepancy is Officer O'Keefe. He was a driver of one of the cars. He said, I drove the car. All officers said that they parked and got out on foot. So there is nobody who says, no, I was riding around. All of them said, we got out and we were on foot. Can I back up a minute, though, because, you know, looking at the attachments to your brief, these GPS charts certainly made me think that an expert would have been necessary to get these charts properly into evidence. And you don't go through that process. You have only the one person from a different case, the 30B6 witness from a different case. And so I'm not sure what we can make of this GPS evidence at all. First of all, there are three types of evidence. There is the evidence that they gave us, the documents they gave us, which were maps and data sheet. There are the Google Maps that we produced by putting the X and Y coordinates into a Google Map application. But you're already challenged on that. Okay. But Captain Reisig testified. He was there, the person most knowledgeable in the Office of Emergency Management Communications, that the city designated in this other case. Are you really saying that you would have given this bunch of data to the jury and had them figure out exactly how this chase unfolded? What Reisig would have been able to testify to is very basically it was not expert. He was not drawing conclusions. He was only explaining, he would have explained records. Why was he not an expert? I just don't see where sort of ordinary human experience gets you to decipher these charts. What he would have testified to is that there was only one GPS system, that he would have testified as to the relationship between the data. But why wasn't he called in this case? I mean, his testimony from the other case is from a different time. Maybe you would have gotten him to testify, which you're now saying, but it's a different time. And it's really even more just what does this data reveal? It actually, he said that this Gray Island system was the only one that was operating in 2011. So it wouldn't matter that he was testifying in another case. He was their employee. And he was a police captain who was assigned to OEMC, who was the most knowledgeable about GPS. He would not have drawn any conclusions. He would have explained the charts. But there's no rule. I mean, I can't think of a part of Evidence Rule 702 that says if it's your own employee, you don't have to qualify them as an expert. We are saying, first of all, you don't need an expert here because the GPS is a commonplace system, and we've cited the First Circuit and the Third Circuit that say that, that say that you don't have to have an expert. An expert disclosure wouldn't have made any sense in here, because the purpose is to give an opportunity to the other side to disqualify on Dover grounds and to retain rebuttal experts and hold additional depositions. But he was their employee. They were hardly in a position to disqualify him. They would not have retained rebuttal witnesses. He was always accessible to them to talk, for them to talk to. And what he would have done is just explained the charts. And one thing they do not contest on appeal is that our Google Maps were somehow, that we couldn't do this, it was incorrect. We said, we will bring a computer to court. You take the x-coordinate, you take the y-coordinate, you put it into the program, and you get a point. And then you put an x-coordinate and a y-coordinate in, and you get another point. That's how you build a map. And it was exactly how the police had built their maps. And their maps, if you just look at their maps, it shows that the cars never went down that alley. You just look at the condensed map that has all the carrots that are kind of condensed. And what Ryasek said in this other case, and he would have said in our case, is you can take those same x and y-coordinates, just as we did, put it into a different mapping application, and you could have the routes. The other thing that the city is not contesting is that the GPS shows that they were continuously in motion. And I started talking about Officer O'Keefe. O'Keefe said, I was driving the car, and yet he can't be driving a car that's in constant motion and also be running down an alley picking up drugs. I'm not sure why any of this matters substantively. This all goes to the procedural basis for excluding the expert in the GPS evidence, but I'm not sure why the details of the chase make a whole lot of difference here, because once Hiles takes off running in flight from the police when they approach this intersection, they have reasonable suspicion to stop him. And so the only question we have is the legality of the warrantless entry into your client's home. And by the time that is conducted, they know that he has fled into that home, and it's not his home. And so they're dealing with, at the very least, a criminal trespass and possibly a burglary. And your client, Michael White, himself said, that guy doesn't live here, when they approached. So they've got probable cause to entry. It's clearly a hot pursuit situation, regardless of which path which of the officers took and who was in the car and who was not in the car and who was on foot and setting aside the drugs. They've got probable cause to entry based on Hiles' own entry into a home that's not his. The path becomes really important because of what you pointed out, that the drugs were saying that the drugs were not found in the alley. Right. Set aside the drugs. Take the drugs completely out of the picture. They've got probable cause because Hiles has just fled into a home that's not his, and they don't know if he is armed and dangerous, but they know that this is not his home. Well, we have two residents outside the home. We have Michael White and his sister saying, don't break down our door. Well, right, but they're also saying, he doesn't live here. They're saying he doesn't live here. I mean, Michael White is understandably saying, I have a key. He's prepared to let them in if there's any hurry, and they don't. But I think that's right. If we just look at this case as essentially the whites saying the police barged into our house and stayed there too long, I'll just totally simplify it, all of that chase does nothing but get them to the front door of the house. And if we disregard the drugs, as Judge Sykes is suggesting, we still have the police observing Hiles barge into the house, which probably has people in it. There are people standing around. So why don't they have the kind of the hot pursuit and probable cause to go into the house? Well, for several reasons. First of all, trespass was not ever brought up at trial. Does that matter, though? But the Supreme Court has said it doesn't make any difference if there's probable cause for something. And what we're dealing with is simple trespass misdemeanor. This was never presented to the jury. In fact, the jury was instructed that there is probable cause because of the drugs. So the trespass never came in at the trial. So suppose that's error. We would still have to decide whether it was harmless error, wouldn't we? You know, frankly, if those officers had not gone into that house and Hiles had harmed the family, you'd be here arguing that it was unreasonable for the officers to stay outside. And, you know, at least one of the plaintiffs signed a complaint for trespassing. I'm sorry, I didn't hear what you said.  One of the people signed a complaint? Yes, one of the plaintiffs signed a complaint for trespass against Hiles. And there was a whole explanation behind that. She was given a blank form to sign. She was not told that she was going to be signing a criminal charge against him. She did not consent for them to come into the home. Didn't the district court, though, make a finding of fact about consent? I understand that's her position, but didn't the court find that she did consent? After the court barred us from bringing in any proof that in order to have consent to search, there's an actual form that has to be signed, and the judge would not let us cross-examine on that or bring in the form. Before your time runs out, I want to know whether you are in any way, even if we thought the entry was okay, even if we thought the initial search of the room where Hiles is hiding out is okay, are you making a separate argument about the officer's decision to stay in the house for another couple of hours after they have Hiles under control as part of your claim? Absolutely. And we were barred from calling Jill Maderick from the city of Chicago, and she would have said that given the time that the sergeant called in, that there was at least two hours that he was there. They searched the house. We claimed that there was no – this wasn't a cursory search. This was into cabinets and into beds and closets and that type of thing. And the White family said that they didn't authorize that. So the entry into the house and the stay in the house, putting the gun to Linda White's head, all that we think is really important. And because the judge gave the jury instruction that what the police did was absolutely okay, that Hiles had drugs, he dropped drugs, they had probable cause to enter the house, that colored what happened with the excessive force. Because what the jury thinks is, oh, the police did everything right. We are instructed, but we have to accept as a matter of law that what the police did was right. So maybe Michael White got in the way. It really colored our ability to prove anything in the case. We couldn't prove the excessive force. So that finding, that judicial notice, that instruction to the jury, was all extremely harmful to our case. And I'll save the rest of my argument for rebuttal. That will be fine. Ms. Dmitrieva. Your Honors, may it please the Court, my name is Irina Dmitrieva. I'm representing the defendants in this appeal. Before you even start, I would just like to get one question out of the way. I want to know if the city concedes that it was error for the district court to allow the plaintiff to challenge the facts that came in via the transcripts of Hiles' plea hearing. Because I don't think I can recall, but maybe you can, the use of judicial notice to treat a court transcript as established an incontestable fact. Your Honor, to answer your question, yes, it was not appropriate technically to take judicial notice of the factual basis for the plea, but we have an explanation for it, if your Honor would be interested. It's critical in this case, the time point at which the district court gave conclusive effect to the conviction and the guilty plea, including the factual basis. That was done not only at the closure of the plaintiff's case in chief, but actually at the closure of all trial testimony, because defense did not call separate witnesses. All witnesses were addressed and cross-examined in the time frame of the plaintiff's case in chief. And after all the evidence was put up, and the plaintiff did not introduce any contradictory evidence at all, the court, in connection with entering directed verdict on the plaintiff's claim of illegal entry, then deemed the factual basis of Hiles dropping narcotics in the background as conclusive. And so when we pay attention to the time frame, and that there was really no contradictory evidence at all at trial that would have contradicted those facts, and the court deemed this evidence conclusive, then in this particular instance, whatever technical error was in taking judicial notice of the factual basis, it was absolutely harmless error. And indeed, you know, the state attorney's recitation of the factual basis was urged by the plaintiff's counsel, you know, in this case, because all the city wanted published to the jury was the first two pages of that transcript. But they were going to see it all, though. I mean, there was some back and forth in the briefs about this. The whole thing was going to come in, even if you were planning on reading only a page or two. Well, Your Honor, I went through the transcript many times, and I would actually disagree with this characterization. I believe the city was very clear in its motion for judicial notice and also in its presentation to the court that it wanted only the first two pages of the guilty transcript published to the jury. And there was a reason for it, why plaintiffs wanted the entire transcript, and potentially, you know, the city might not have wanted it, because there is a minor discrepancy in Officer Heffel's testimony, where he testifies that he's the one who picked up the drugs while, you know, at trial. You know, he's saying that officers behind him who picked up the drugs. And so the city wanted the first two pages of the transcript, which would have kept the factual basis for the plea out of publication to the jury. And it's the plaintiff's own litigation strategy, trial strategy, of potentially exposing the inconsistencies that ended up, you know, with the entire guilty plea transcript read out to the jury. So it was definitely, you know, the plaintiff's trial strategy that resulted in that. And, you know, and it was a harmless error, you know, at this point, because upon the plaintiff's urging, you know, the entire transcript was read to the jury. And so the jury, you know, the jury was exposed to everything. And coming back to the directed verdict on the plaintiff's illegal entry and search claims. Well, I want to disaggregate those. Just as I was suggesting to your opponent, Ms. Dimkar, even if we thought the entry itself was justifiable, either because of the observed trespass or because of the drugs or some combination of the two, observing him trying to get into other places, and even if we thought that the search of the room in the back where he's hiding when the police come in is entirely appropriate to make sure that he hasn't dropped a gun or more drugs or whatever, I don't see how, once he is handcuffed and removed from the house, he's not there anymore and hasn't been in the house long enough to go very many places. What justifies a two-hour search of the house at that point? It seems to me just because the police walk in doesn't mean they get to stay forever, and they certainly don't necessarily have the right to rip the house apart. Two points, Your Honor. First, the testimony of many witnesses was that not two hours. At one point, when plaintiff's counsel was arguing to the court, they stayed at the most 30 minutes. Indeed, there is testimony from police officers that they were on the scene anywhere from 30 to 40 minutes, but they were in the house for maybe 10 minutes. So the two hours, I'm not quite certain at this point where it's coming from because several witnesses testified consistently it was 30 to 40 minutes on the scene. And second point, Your Honor, nowhere in their opening brief that we could decipher that plaintiffs raised the illegal search claim as a separate claim. It seems to me they're pursuing only legal entry claim. There are no arguments, legal arguments whatsoever made about the search. I didn't see the way this was litigated in the district court a sort of separate theory that the search was unreasonable in duration or unreasonable in scope. I understood it to be a claim that it was illegal because the entry was illegal. Right. And so we didn't respond really to this in our brief because we didn't understand plaintiff's reason separately. So what would the difference be in the argument? I mean, in the reply brief, they respond to this point that I believe you made in your brief, and they say, no, we've all long been complaining about both the entrance and the search. It's all the Fourth Amendment, right? Right, but the way at least we read, it was not very easy to comprehend the precise claims, but the way we understood it is that the search claim rises or falls with the illegal entry claim, but there were no separate legal arguments made in which the entry would be legal, but somehow the following search would not be. So your question, frankly, it takes me a little bit by surprise. So to the extent you would like to pursue it, we would want to have an opportunity to respond to it somehow, maybe in a post-argument memorandum, if you would like to pursue that, because we did not understand it to be a separate claim. In the reply brief, the plaintiffs contend that the city defendants never relied on the probable cause for trespass as the justification for entering the house, instead that they relied on the dropped drug. First of all, is that correct? And secondly, where in the record will we find the city defendants relying on the trespass to justify entry in the house? Yes. Your Honor, I would not believe that that's an accurate argument. The issue was definitely raised below of criminal trespass, both on summary judgment and at trial. In particular, in the city's summary judgment brief, record 159 at page 9, the city argued that it was reasonable for the officers to assume that Hiles posed a risk to the residents of 1119 North Springfield, as Hiles had been, among other things, seen to enter a residence that the officers believed do not belong to Hiles. The same argument was incorporated by reference in the city's response to the plaintiff's summary judgment motion, record 174 at 8. Additionally, when we talk about trial, the facts as they were known to police officers when they entered the house were thoroughly explored at trial. Officer Hethel testified, obviously, that before he entered the house, he saw Hiles try the gates of nearby houses, and he had a very solid foundation, concrete belief that Hiles definitely did not leave at the residence. And that's record 284 at pages, record pages 76 and 77. Plaintiff cross-examined Hiles extensively on what he saw or perceived and on the circumstances of what he knew before he entered the White's residence. Plaintiffs also put up their own witnesses who disputed that Hethel was following Hiles at a sufficiently close proximity to be able to observe Hiles open, try the gates before running into the White's residence. But obviously, they have their own plaintiff, Michael White Sr., testifying that before Hethel even entered his house, he told him, Officer, I live here. I do not know the guy who ran in, but I have the key to the door. So even irrespective of Officer Hethel's testimony, whether he saw Hethel try the gates, we have plaintiff's own statement affirmatively putting officer on notice that the person who just ran in does not You know, they have neighbors, Anthony Ray and Shama Holmes testifying as to the distances between the offices. Actually, Anthony Ray corroborates Officer Hethel's testimony because he testified that the police came right after him. One police officer came running right after the boy. Shama Holmes, who is on the second floor of a neighboring apartment, cooking, you know, she's saying, no, you know, I saw first Hiles locking the door behind him and only then I heard the police radio, you know, in the vacant lot. And then we have a testimony of Constance Jernigan who is saying, you know, only after Hiles ran into the door, I saw police cars coming. So the circumstances surrounding the entry and the proximity and what the officer knew, they were thoroughly explored at trial. So for plaintiffs right now to argue that they were somehow denied an opportunity to explore those facts on the basis of criminal trespass, that does not have any basis and ignores the evidence in the record. And certainly, moreover, under Illinois law, criminal trespass to a residence is not a minor offense. It could be a class 4 felony if the person who is running into the house has a reason to know that there are people inside. And on the facts of this case, as plaintiffs themselves testified, it was Friday night, the dinner was just done, the lights were on in the house, Linda White testifies. Kylie is sweeping the floor, you know, in the front room with a large bay window. So, you know, the facts, objective facts known to a reasonable officer, they certainly support a class 4 felony that is going on in the officer's presence here. Would it make any difference if it were a misdemeanor? Excuse me? Would it make any difference if it were instead of a class 4 felony still in the misdemeanor range? Your Honor, no, we do not believe so because under Illinois law, a class A misdemeanor is punishable by up to a year in jail. And indeed, there was a case in Illinois Supreme Court where people be aware, where the Illinois Supreme Court held that the officer's entry, warrantless entry into an apartment to arrest the person for DUI offense, which is exactly a class A misdemeanor under Illinois law, did not constitute a Fourth Amendment violation because under Illinois law it's punishable by up to one year in jail. And so it's a serious offense for Fourth Amendment purposes. With respect to GPS exhibits, we absolutely believe that it was plaintiff's own litigation strategy that they did not want the raw data before the jury. They absolutely wanted a person who would explain and interpret those exhibits to the jury. And without this explanation, which actually called for a conclusion, an expert conclusion that the car were in constant motion, this evidence was meaningless. It did not have a high probative value at all. What about their statement, never mind whether we have the speeds right, but they suggest that there's some streets, like that alley, that the cars just were never on. So at that more modest level, don't the data show us something? I mean the police officers are talking about racing down this. I believe what your owner is referring to is a third car with Officer Keefe and Sergeant Ramaglia. And I believe Officer Keefe testified that he never turned the car off. He said, I put the car in park, it hardened and I ran. And Sergeant Ramaglia actually testifies, I don't remember that our car was unhardened. I actually think it was in another alley. So, you know, the officers, and they were in the third car. So, you know, in a sense, they are not the ones, like O'Keefe or Ramaglia, they are not the ones who even see Hiles drop the narcotics. They are not the ones who are entering into the White's apartment on his heels. So their testimony and respect is not even pertinent to the legal issues. And from their standpoint, it's a very fast situation, fast evolving situation. There is some inconsistency that plaintiffs were able to explore at trial. They certainly zeroed in on it in their closing argument to the jury where they said, please pay attention to the inconsistencies in the officers testimony. How come O'Keefe was saying that he left the car hardened when exiting the White's residence to fetch the complaints. He's saying the car is right there. So there are some inconsistencies even in the officers recollection of it. But it's not uncommon for people to have minor inconsistencies in recollection because they were first deposed in February, March 2014, which is more than two and a half years after the incident. The trial took place even afterwards. And to put the things in perspective, the entire incident took about four minutes from the moment that they saw Hiles at the corner of Thomas and Pulaski to the arrest inside. It was less than five minutes. It was closer to four minutes. So it was a very fast situation. It's not uncommon that officers might have less than perfect recollection of the events. And it certainly was easy enough for the plaintiffs if they really truly believed that GPS evidence was really key to their case. It is not clear why they even did what the plaintiffs did in this other case and why they didn't serve Rule 30b-6 notice on the city, asking the city to designate a person who would have been knowledgeable about GPS data at issue here in this case. Because plaintiffs now try to extrapolate what Captain Reichert would have said. But we don't know what he would have said. He's never seen the data in this case. He's never said a word about this case. And certainly, even in this other deposition, he was never asked what happens to the vehicles in between those points, recorded points, because the GPS data has gaps in there of varying duration. Sometimes it's one second, sometimes it's 23 seconds. And certainly, plaintiffs believe that the third car was in constant motion, but there is indeed a gap of approximately 46 seconds where the car was potentially stationary and the speed is recorded at zero. So it's certainly not physically impossible for Officer O'Keefe to exit the car and for Magalie to exit the car as well. And so this is what, and certainly plaintiffs, they are presented to the district court themselves that they wanted, that the data without an explanation from Officer Reichert would be complicated. And it's not obvious to the jurors, so they needed some person with specialized knowledge to explain it. And the city was prejudiced at this point because the city absolutely would have called a rebuttal witness of expert knowledge. And with respect to convictional guilty plea, I believe we already covered it, but it was obviously admissible, not so much for the issue of probable cause, but to corroborate the officer's version of the events, this testimony, this evidence was admissible and to the extent any technical error was harmless. So if your owners have any more questions. I think not. Thank you very much. Thank you so much. Ms. Dimkart, you have a little bit of time. Yes. First of all, it's clear that we believe that the police officers lied at their deposition and at trial. And at trial, I asked them, I took them through the whole path. Did you drive north on Pulaski? Did you drive east on Division? Did you drive the whole path that's on the GPS? And they said that they never drove there. All of the officers disclaimed following any of the paths that were in the GPS. The defendants never argued that Reisig was an expert. They never Going back to the motion for summary judgment, the judge ruled that the evidence was admissible. Defendants never said this is expert testimony. At trial they never even objected to Reisig being an expert. They said he wasn't timely disclosed as a lay witness. It was the judge, sua sponte, at trial, once the defense counsel says that plaintiffs are trying to show the defendants are perjuring themselves. And the judge said, basically, that's not going to happen. It's irrelevant. That's not coming in. But up until that point, he thought that the GPS evidence was admissible. He considered it at the motion for summary judgment. It wasn't until at trial that the judge himself said, gee, isn't this man an expert? And that was after defense counsel said, I think the plaintiffs are trying to show that the defendants are perjuring themselves. Now going to that point, I think that's very important because we should have been able to show that these police officers were lying. That they were not telling the truth. And they were untruthful about whether they parked or whether they were driving, whether they went up the alley, whether they didn't go up the alley. They were untruthful about that. They're probably untruthful about a lot of other things having to do with entering the house and having to do with the search of the house and consent and everything else. So why shouldn't we have been able to show through GPS that they were not truthful? And the jury should have been able to consider that. Whether it's relevant or not, the probable cause and the exigent circumstances. So for impeachment, you're saying. Right, for impeachment. And they never explain, the defendants never explain, and I ask for your patience in looking at some of the maps and reading our description. They never explain why these vehicles are continuously moving and how they can reconcile that with six officers saying they parked, got out of the car, ran, three of them going down the alley. Well the GPS shows zero miles per hour here and there. But it shows zero miles per hour in one of their routes when they were going down a different alley before they pulled up in front of Springfield. It also, if you, it goes, there's a time when they were at Thomas and Pulaski. It goes from 1 to 4 to I think 26 miles an hour. But it's also changing direction radically. And so what they were doing is they turned down assentment. They couldn't have jumped out of the car and done any of this. And it also wasn't what their story was. It wasn't what their story was at all. Okay, so you need to wrap up. Okay, just a couple things that we were brought up. First of all, the I think actually your time is up. Okay, yes, I did want to say something about the neighbors. But I will rest at this point. Thank you. Alright, thanks so much. Thanks as well to the city. We will take this case under advisement and the court is